# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL PAUL SCARLETT, | 3:16-cv-00320-MMD-WGC |
| Plaintiff, | **REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| vs. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security Administration, | |
| Defendant. | |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4.

Before the court is Plaintiff's Motion for Reversal and Remand. (ECF Nos. 13, 14 (brief).) The Commissioner filed a Cross-Motion to Affirm and Opposition to Plaintiff's Motion for Reversal and/or Remand. (ECF No. 16.)

After a thorough review, the court recommends that Plaintiff's motion be denied, and that the Commissioner's cross-motion be granted.

## **I. BACKGROUND**

On November 13 and 19, 2012, Plaintiff completed applications for disability insurance benefits (DIB) under Title II of the Social Security Act and for supplemental security income (SSI) under Title XVI of the Social Security Act, alleging disability beginning September 30, 2012. (Administrative Record (AR) 210-223.) The applications were denied initially and on reconsideration. (AR 142-161.)

///

Plaintiff requested a hearing before an administrative law judge (ALJ). (AR 163.) ALJ Eileen Burlison held a hearing on November 3, 2014. (AR 42-72.) Plaintiff, who was represented by counsel, appeared and testified on his own behalf at the hearing. Testimony was also taken from a vocational expert (VE). On February 19, 2015, the ALJ issued a decision finding Plaintiff not disabled. (AR 8-22.) Plaintiff requested review, and the Appeals Council denied the request, making the ALJ's decision the final decision of the Commissioner. (AR 1-4.)

Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). Plaintiff argues: (1) the ALJ failed to fully develop the record with respect to Plaintiff's mental impairments; and (2) the ALJ improperly rejected the opinion of the only examining expert which identified greater physical limitations than those set forth in the ALJ's residual functional capacity finding.

## II. STANDARD OF REVIEW

**A. Substantial Evidence**

The court must affirm the ALJ's determination if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec. Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

To determine whether substantial evidence exists, the court must look at the record as a whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*, 740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Id*. (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set aside if the ALJ

did not apply proper legal standards." *Id*. (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

**B. Five-Step Evaluation of Disability**

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(b).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.1520(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. *Id*.

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R. § 404.1520(a)(4)(iii), (d) and

§ 416.920(a)(4)(iii), (c). The Commissioner presumes the Listed Impairments are severe enough to preclude any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past relevant work is that which a claimant performed in the last fifteen years, which lasted long enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and § 416.920(b)(1).

In making this determination, the Commissioner assesses the claimant's residual functional capacity (RFC) and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of limitation, and medical reports, to determine what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and § 416.945(a)(3).

A claimant can return to previous work if he or she can perform the "actual functional demands and job duties of a particular past relevant job" or "[t]he functional demands and job duties of the [past] occupation as generally required by employers throughout the national economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and citation omitted).

If the claimant can still do past relevant work, then he or she is not disabled for purposes of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); see also Berry, 62 F.3d at 131 ("Generally, a claimant who is physically and mentally capable of performing past relevant work is not disabled, whether or not he could actually obtain employment.").

If, however, the claimant cannot perform past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform work available in the national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-42, 144. This

means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Gutierrez*, 740 F.3d at 528. If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a vocational expert or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

"The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted). The Grids place jobs into categories by their physical-exertional requirements, and there are three separate tables, one for each category: sedentary work, light work, and medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id*. Each grid has various combinations of factors relevant to a claimant's ability to find work, including the claimant's age, education and work experience. *Id*. For each combination of factors, the Grids direct a finding of disabled or not disabled based on the number of jobs in the national economy in that category. *Id*.

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

### III. DISCUSSION

**A. ALJ's Findings in this Case**

At step one, the ALJ found Plaintiff met the insured status requirements through December 31, 2017, and had not engaged in substantial gainful activity since the alleged onset date of July 21, 2012. (AR 13.)

/ / /

At step two, the ALJ concluded Plaintiff had the following severe impairments: heart attack, hypertension, seizures, anxiety disorder and alcohol dependence. (AR 13.)

At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 14.)

At step four, the ALJ assessed Plaintiff as having the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except he was limited as follows: he could lift and carry ten pounds frequently and twenty pounds occasionally; he could walk and stand and sit six hours of an eight-hour workday; he should avoid repetitive climbing and perform postural activities on an occasional basis; he should avoid extremes of both cold and heat; he should avoid hazards, such as working at heights or operating dangerous, moving machinery; and he was limited to simple, routine work. (AR 15-19.) The ALJ then concluded Plaintiff was unable to perform any past relevant work. (AR 20.)

At step five, the ALJ determined, based on VE testimony, that considering Plaintiff's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including cashier II (Dictionary of Occupational Titles (DOT) 211.462-010; assembler (DOT 712.687-010); and packing-line worker (DOT 753.687-038). (AR 20-21.) As a result, the ALJ found Plaintiff not disabled from July 1, 2012 through the date of the decision. (AR 21.)

**B. Plaintiff's Mental Impairments**

**1. Summary of Argument**

Plaintiff argues that on April 3, 2013, Richard W. Lewis, Ph.D., evaluated Plaintiff on behalf of the Social Security Administration, and stated that more data was needed to complete a functional assessment, and that the Wechsler Adult Intelligence Scale-IV (WAIS-IV) testing was recommended. (ECF No. 14 at 7-8, citing AR 362.) Plaintiff contends that the ALJ failed to address this recommendation or assign any weight to Dr. Lewis' opinion, and instead improperly relied on her own observation that Plaintiff appeared to process questions without difficulty during the hearing in order to support her finding that Plaintiff only had moderate limitations in mental functioning. (ECF No. 14 at 8, citing AR 15.) Plaintiff contends that because the ALJ failed to provide reasons for rejecting Dr. Lewis' opinion, the court must credit that opinion as true as a matter of law. (ECF No. 14 at 8, citing

1 *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), SSRs 96-3p, 06-3p, 16-3p.)

2    As a result of the ALJ's failure to develop the record with respect to Plaintiff's mental limitations, Plaintiff contends that the ALJ's step three finding is contrary to the law, arguing that IQ testing is necessary when an intellectual disability is at issue. (ECF No. 14 at 10-11, citing *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 929 (9th Cir. 2014)). Plaintiff further asserts that the RFC finding is not based on substantial evidence in light of the failure to develop the record concerning Plaintiff's mental limitations. (ECF No. 14 at 11.) As such, Plaintiff asks the court to remand for further proceedings to develop the record with respect to intellectual disability.

   The Commissioner acknowledges that Dr. Lewis stated more data was needed to complete a functional assessment, and deferred providing a diagnostic impression. (ECF No. 16 at 2.) The Commissioner contends, however, that this did not trigger a requirement that the ALJ order further psychological testing. (*Id.*) The Commissioner asserts that no physician ever diagnosed an intellectual disability, Plaintiff did not himself assert it, and his attorneys only now raise the issue that more intelligence testing should have been obtained. (*Id.*)

   The Commissioner acknowledges that Plaintiff did allege difficulty concentrating, mood swings, difficulty taking direction from authoritative figures, lack of motivation to perform daily activities, emotional withdrawal and isolation, memory problems, and difficulty with social functioning, but contends that the ALJ found his symptoms not entirely credible, and Plaintiff does not challenge this finding. (*Id*. at 4, citing AR 48, 54, 257, 264, 273.) The Commissioner notes that Plaintiff did have anxiety, but points out that his mental status examinations were generally unremarkable. (*Id*., citing AR 18, 360, 493, 501, 504-05, 507, 508, 514, 515, 526.) In addition, the ALJ did assess anxiety as a severe impairment, and limited Plaintiff to simple, routine work.

**2. Dr. Lewis' Report**

Plaintiff was referred to see Dr. Lewis for a mental status examination. (AR 360.) Plaintiff's wife told Dr. Lewis about a psychotic incident Plaintiff had where he thought someone was in his mattress. (AR 360.) His only contact with psychiatry resulted in an admission to West Hills for three days. (ER 360.) His wife also discussed an incident were he started screaming and slashing a mattress with a large knife to stop the voices he was hearing, while she was still in the bed. (AR 360.) On another occasion

7

when he was in the ICU, he thought voices were talking through his feet. (AR 360.) He took Risperidone after his stay in West Hills, which made him rational. (AR 360.) Plaintiff relayed to Dr. Lewis that he had enrolled in school in special education, and that he recalled being told he was mentally retarded. (AR 361.) Plaintiff described his moods as upset and angry, and referenced that he beat up a man in a wheelchair several years prior. (AR 361.) When Dr. Lewis administered testing, Plaintiff was unable to make the first subtraction in serial sevens, was unable to spell "world" backward, and never grasped directions for alphanumerical counting.

Under the heading "Functional Assessment and Analysis" Dr. Lewis wrote: "More data is needed to complete a functional assessment and the [WAIS] IV is recommended." (AR 362.) Diagnostic impressions were deferred. (AR 362-63.) He indicated that Celexa, Risperdal and valium were taken for anxiety, panic attacks and depression. (AR 254.)

**3. Analysis**

The court finds that the ALJ did not err with respect to assessing Plaintiff's mental limitations, as Plaintiff contends.

The ALJ specifically noted Dr. Lewis' findings, including the notation that more data was needed to complete a functional assessment, and that he had deferred providing a diagnostic impression. (AR 19.) At that point, the ALJ stated nothing further regarding Dr. Lewis' recommendation, but went on to state that she was assigning great weight to the State agency consultants, citing to their reports, which included State agency psychological consultants Susan Kotler, Ph.D. (original application for benefits), and Leif Leaf, Ph.D. (reconsideration). (AR 19.) The ALJ found that their assessments were reasonable and consistent with the evidence as a whole. (AR 19.) Both of these doctors concluded that the additional testing recommended by Dr. Lewis was not warranted. By adopting the opinions of these doctors, the ALJ rejected Dr. Lewis' recommendation.

A claimant must establish disability as a result of "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(a)(1). Evidence of this may include medical opinions which are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms,

8

diagnosis and prognosis, what [the claimant] can still do despite the impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Medical opinions are considered with other relevant evidence. 20 C.F.R. § 404.1527(b).

"'In disability benefits cases ... physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "Courts '"distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). "'As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.'" *Id.*; *see also* 20 C.F.R. § 404.1527(c)(2). "[T]he opinion of a treating physician is thus entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012 (citing *Ryan*, 528 F.3d at 1198). "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Ghanim v. Colvin,* 763 F.3d 1154, 1160 (9th Cir. 2014) (citation and quotation marks omitted). "'The weight afforded a non-examining physician's testimony depends on the degree to which [he] provide[s] supporting explanations for [his] opinions.'" *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison*, 759 F.3d at 1012.

Here, Dr. Lewis findings were contradicted by the State agency consulting psychologists, as they found that further testing was not warranted. Therefore, the court finds the ALJ did reject Dr. Lewis' recommendation for more testing, and the ALJ was required to set forth specific and legitimate reasons

supported by substantial evidence for adopting the consultants' findings over those of Dr. Lewis. Here, the ALJ stated that consultants' opinions were reasonable and consistent with the evidence as a whole.

While the ALJ might have elaborated further, the court finds that in this case, the ALJ's finding that the consultants' opinions were reasonable and consistent with the evidence in the record is specific and legitimate when read in conjunction with the consultants' statements, is supported by substantial evidence in the record.

Dr. Kotler noted that Plaintiff alleged disability from physical conditions, anxiety, panic attacks, and depression, and that the medical records described a history of anxiety and depression as well as alcohol abuse. (AR 70.) Dr. Kotler went on to discuss the mental health consultation (with Dr. Lewis) which did not indicate significant disturbance of mood, affect, behavior, thought process/content, and communication. (AR 70.) She noted Dr. Lewis' findings that Plaintiff performed poorly on the tested areas, and that Dr. Lewis was unable to give any diagnoses or formulate a functional assessment. (AR 70.) Dr. Kotler went on to state that Plaintiff's long history of alcohol dependence exacerbated his symptoms of anxiety and depression that were otherwise well controlled on medication. (AR 70.) In addition, she found that his seizures could be contributing to cognitive dysfunction, but were exacerbated by medication noncompliance and/or alcohol abuse. (AR 70.) She noted that Plaintiff reported being mentally retarded and in special education, but pointed out that his Social Security forms did not indicate special education and despite alleged mental retardation, he was able to sustain detailed work as a forklift operator for five years. (AR 70.) Dr. Kotler opined that the near-inability to perform most of the tasks at the examination was most likely related to the effects of ongoing alcohol abuse. (AR 71.) She concluded that the records indicated that his symptoms and function improved significantly when he maintained sobriety and constituted material evidence that when abstinent he was able to sustain concentration, persistence and pace for detailed tasks. (AR 71.) As a result, she determined that further development with an IQ test as recommended by Dr. Lewis was not warranted. (AR 71.)

On reconsideration, Dr. Leaf generally reiterated Dr. Kotler's findings, including that when Plaintiff abstains from alcohol he can sustain concentration, persistence or pace for detailed tasks, and that further development with an IQ test as recommended by Dr. Lewis was not warranted. (AR 107-08.)
///

Their opinions are supported by the record:

Plaintiff's medical records do reference a past history of depression and mood problems (AR 305, 529, 535), but during the relevant time period his mental status examinations were generally unremarkable. (*See* AR 324, 328-330, 337, 495-96, 502-505, 514, AR 515, AR 526.)

He was admitted to the emergency room after he sustained a head injury in May 2010, and reported hallucinations and trying to stab an intruder with a knife that he thought was in his mattress. (AR 456-457, 454.) Neurology felt that his acute psychosis was secondary to his seizure and blunt trauma to his head. (AR 454.) He was referred to psychiatry for evaluation, but there were no records from what was reported to be a three-day stay at West Hills. (AR 458.)

There is no other mention of his mental state until February 2012, when he saw Dr. Jennifer Vogt, who noted he was positive for depression and anxiety. (AR 305-08.) The emphasis was on his anxiety. At that time, his medications were renewed and he was advised to follow up. (AR 309.) When he saw Dr. Vogt again on April 10, 2012, she had a long discussion with him about non-compliance in terms of alcohol and medication, and advised him to get inpatient help with his alcoholism. (AR 313-317.) He saw Dr. Vogt on May 10, 2012, and had been sober for a week. (AR 321-22.) She described his mood as upbeat and happy about being sober. (AR 324.) On June 26, 2012, he had been sober for two months, and was described as motivated. (AR 328-330.) He did not see Dr. Vogt for another six months, and in that time he lost his job and started drinking again. (AR 334.) She noted his history of anxiety. (AR 334.) She described his mood as "okay." (AR 337.) There was no further pertinent discussion regarding any mental impairment.

In December 2012, he presented to the emergency room after having four seizures. (AR 343.) He had slurred speech. (AR 346.)

In February of 2014, it was reported that he was not able to afford his seizure medication as he had been without insurance for two years. (AR 508-511.) At that time, it was noted that he was positive for neurological deficit, lip smacking and unresponsiveness. (AR 508-511.) He saw the doctor again in March, April, and May of 2014, and was described as having an appropriate mood and affect. (AR 502-505.) In July 4, 2014, where he was admitted to the emergency room for intoxication he was still described as cooperative, with no anxiety. (AR 495-96.)

In sum, the court finds that the ALJ's decision to assign great weight to the State agency psychological consultants' opinions over the recommendation of Dr. Lewis for further testing is supported by substantial evidence in the record. The records do not support a conclusion that Plaintiff suffered from a severe mental impairment apart from anxiety, which was assessed by the ALJ (and Plaintiff does not contest these findings). Therefore, the ALJ did not err in failing to develop the record with respect to Plaintiff's mental impairments. Plaintiff's motion should be denied and the Commissioner's motion should be granted insofar as the mental impairments are concerned.

**C. Physical Medical Opinion Evidence**

**1. Summary of Argument**

Next, Plaintiff argues that the ALJ improperly rejected the opinion of the Social Security Administration's consultative examining physician, Pamela K. Corson, M.D., which Plaintiff contends identified far greater physical limitations than those set forth in the ALJ's RFC finding.

Plaintiff contends that examining physician opinions are generally accorded the most weight, and are favored over the opinions of non-examining physicians, and medical opinions may not be rejected absent "clear and convincing reasons." (ECF No. 14 at 17.) Plaintiff argues that the ALJ did not give clear and convincing reasons, and did not give any consideration to the factors set forth in 20 C.F.R. § 404.1527(c). The ALJ gave Dr. Corson's opinion "some weight," finding that the standing/walking and postural limitations were inconsistent with the findings in the record in light of the unremarkable physical examinations, and gave greater weight to the non-examining medical consultants because Dr. Corson based her opinion on a one-time examination and the consultants had access to the entire medical file. (ECF No. 14 at 18.) Plaintiff argues that it is not clear that Dr. Corson did not have an opportunity to review the same record the non-examining consultants did, but referred to reviewing records, and there is no reason to assume the agency withheld records from Dr. Corson that the non-examining consultants were provided. (*Id*.) Plaintiff further contends that the fact that Dr. Corson's opinions were based on a single examination is not a legitimate basis for rejecting her opinion because all consultative examinations are one time examinations. (*Id*.)

Plaintiff also contends that Dr. Corson's opinions were not inconsistent with the treatment records. (*Id*. at 19-20.)

Plaintiff argues that if Plaintiff was properly limited to sedentary work, as Dr. Corson opined, Plaintiff's case should be evaluated pursuant to Section 201.00 of the Grids, and he should be found disabled as a matter of law pursuant to Medical Vocational Rule 201.09, which directs a finding of disabled for a claimant limited to sedentary work who is closely approaching "advanced age" (defined as age 50-54), with a high school education limited to unskilled work (as the ALJ found here). (ECF No. 14 at 15-16.)

The Commissioner argues that the ALJ considered and properly assigned some weight to Dr. Corson's opinion, and appropriately finding that the opinion regarding standing, walking and postural limitations was inconsistent with the findings of the record as a whole. (ECF No. 16 at 5.) The Commissioner maintains that the treatment providers noted generally unremarkable physical examination findings, which contradicted Dr. Carson's opinion regarding standing, walking and postural limitations. (*Id*. at 6.)

**2. Dr. Corson's Report**

Dr. Corson evaluated Plaintiff on February 12, 2013. (AR 351.) He complained of: mental problems and personality difficulties; status post myocardial infarction with pacemaker placement in 2011 and ongoing chest pain; seizure disorder; alcoholism; and status post embolism. (AR 351.) He reported that he could dress and bathe himself, but was unable to cook, clean or do yard work. (AR 351.) He spent his days watching television. (AR 351.)

Physically, he complained of chest pain every other month with exertion, and could not tolerate exercise. (AR 352.) He had a history of seizures, which were controlled with Dilantin. (AR 352.) He reported drinking a half pint of vodka a day for as long as he could remember. (AR 352.) He took Coumadin for embolism and chronic thrombus. (AR 352.)

On examination, she described Plaintiff as "very tremulous and anxious." (AR 353.) He walked with a shuffle, broad-based gate, and turned his left foot inward. (AR 353.) He could not tandem walk, and could not stand on his heels or toes without falling over. (AR 353.) He could not bend or squat without getting up. (AR 353.)

She stated that his exercise tolerance should not be tested or stressed as he had underlying cardiac disease; the etiology of his seizures was unknown and unlikely to improve; he needed to be treated in

13

a facility for chronic alcoholism; the fact that his INR, seizure disorder and anticoagulation history had been unchecked was bothersome to her. (AR 354.)

She opined: he can stand and walk less than two hours in an eight-hour workday, secondary to the seizure disorder, alcoholism and instability on examination; he could sit for six or more hours in an eight-hour workday, but without treatment for alcoholism there was great risk he would go into delirium tremors; he had no postural capacity as he suffered from alcoholism and seizure disorders and was very unsteady on examination; he could lift ten pounds frequently and twenty pounds occasionally related to exercise intolerance due to chest pain and underlying cardiology pathology; he could reach, finger and handle objects, and had no limitations in hearing, seeing or speaking; travel would be a problem because he did not drive; he should never be allowed to operate moving machinery or at heights due to underlying chronic alcoholism and possible withdrawals and seizure disorder; there were no restrictions to temperature extremes, chemicals, dust, noise or vibration. (AR 354-355.)

### 3. ALJ's Findings

The ALJ considered and gave some weight to Dr. Corson's opinion. (AR 19.) While the ALJ agreed with Dr. Corson's opinion regarding exertional limits, the ALJ found that the opinion regarding standing and walking limits as well as postural limitations were not consistent with the findings of the record as a whole in light of generally unremarkable physical examinations throughout the record. (AR 19.) The ALJ said that she "generously incorporated most of the restrictions cited by both the consultative examiner and the State agency medical consultants[,]" giving greater weight to the State agency consultants because Dr. Corson based her opinions and assessments on a one-time meeting with the claimant. (AR 19.) She stated: "Although the consultative examiner's assessments may offer a valid snapshot of the claimant's abilities on a particular day, they are not necessarily accurate reflections of the claimant's overall physical health." (AR 19.) The State agency consultants "access to and review of the claimant's entire medical record offer[ed] more comprehensive assessments of the claimant's general health." (AR 19.)

### 4. Analysis

Again, because Dr. Corson's opinion is contradicted by the State agency doctors, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for rejecting her

opinions. *See Garrison*, 759 F.3d at 1012. To reiterate, the ALJ may satisfy this burden "by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725).

First, Plaintiff claims that the ALJ did not address the factors in 20 C.F.R. § 404.1527(c). The court disagrees. These factors include: the examining relationship (20 CF.R. § 404.1527(c)(1)), the treatment relationship (20 CF.R. § 404.1527(c)(2)), supportability (20 CF.R. § 404.1527(c)(3)), consistency (20 CF.R. § 404.1527(c)(4)), specialization (20 CF.R. § 404.1527(c)(5)), and any other relevant factors (20 CF.R. § 404.1527(c)(6)).

With respect to the first factor, the ALJ did comment on the examining relationship when she stated that Dr. Corson examined Plaintiff on one occasion. While an examining source's opinion is generally given more weight than a non-examining source, the ALJ explained that while Dr. Corson's assessment might have offered an accurate "snapshot" of Plaintiff's condition on the day she examined him, the State agency consultants' access to and review of the entire record offered a more comprehensive assessment of Plaintiff's health. (AR 19.) While Plaintiff disputes this, Dr. Corson's report did state in terms of record review that she only looked at a record from the emergency room, where Plaintiff was sent for seizures, on December 12, 2012, and some clinic records from the Friendly Clinic, where he was followed for coronary artery disease, alcoholism, and chronic anticoagulation. (AR 351.) The court finds this is a valid statement by the ALJ under the examining relationship factor.

The second factor, the treatment relationship, is not applicable here because Dr. Corson was not a treating doctor.

The third factor is supportability. The more evidence that supports an opinion, and the better an explanation a source provides, the more weight a medical opinion should be given. 20 C.F.R. § 404.1527(c)(3). The weight given to non-examining sources "depend[s] on the degree to which they provide supporting explanations for their medical opinions." *Id.* The Social Security Administration "evaluate[s] the degree to which these medical opinions consider all of the pertinent evidence …, including medical opinions of treating and other examining sources."

/ / /

/ / /

Again, the ALJ commented on the review of records by Dr. Corson as compared to the State agency consultants, and stated that the State agency doctors offered a more comprehensive assessment of Plaintiff's health. Thus, she adequately addressed this factor in her decision.

The fourth factor is consistency. "Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). The ALJ made a finding that the State agency medical consultants' findings were more consistent with the evidence as a whole, while Dr. Corson's was not consistent given the generally unremarkable physical examinations throughout the record. (AR 19.) As such, the ALJ appropriately addressed this factor in her decision.

The fifth factor is specialization. Generally, more weight is given to medical opinions of specialists regarding issues related to their specialty than those who are not specialists. 20 C.F.R. § 404.1527(c)(5). Plaintiff argues that the ALJ failed to give "inherent status" to Dr. Corson's opinion because she was a medical specialist (ECF No. 14 at 17), but the record gives no indication that Dr. Corson was a specialist.

There is no obvious information the ALJ should have considered as an "other factor" under the sixth category of 20 C.F.R. § 404.1527(c). Accordingly, the court finds that the ALJ adequately addressed all of the pertinent factors.

The court will now address whether the ALJ provided specific and legitimate reasons supported by substantial evidence for rejecting portions of Dr. Corson's opinion. The ALJ gave several reasons for rejecting portions of Dr. Corson's opinion. First, she found that the standing and walking limits as well as the postural limits were not consistent with the findings of the record in light of the generally unremarkable physical examinations. (AR 19.) Second, she stated that she incorporated most of the restrictions cited by Dr. Corson and the State agency doctors, but gave more weight to the State agency consultants because Dr. Corson's opinion was based on a one-time meeting with Plaintiff, and she found the State agency doctors access to and review of Plaintiff's entire medical file offered a more comprehensive assessment of Plaintiff's health. (AR 19.) She also found the State agency doctors' assessment to be consistent with the evidence as a whole. (AR 19.)

///

1 |   The ALJ correctly noted that Plaintiff had several trips to the emergency room in 2010, where
2 | he was then discharged in good condition. (AR 17.) He was admitted on February 8, 2010, with
3 | complaints of chest pain, and findings were consistent with acute anterior myocardial infarction. (AR
4 | 471-72.) He was taken to cardiac catheterization and underwent angioplasty and stent placement. (AR
5 | 469.) While in the hospital he had a seizure, and as placed in Dilantin and had no further complications.
6 | (AR 469.) He was discharged in good condition. (AR 469.)

7 |   He was admitted to the emergency room again on May 23, 2010, when he had a seizure after
8 | missing several doses of his medications, and began having hallucinations. (AR 454.) He was monitored
9 | in light of his recent myocardial infarction, and while he required several doses of IV Haldol, his CT
10 | interval remained within normal limits. (AR 454.) He was medically cleared after twenty-four hours and
11 | transferred for psychiatric evaluation and treatment, though those records were not available. (AR 17,
12 | 454.)

13 |   He was admitted to the emergency room again on July 30, 2010, with chest discomfort, and a CT
14 | of the chest revealed a pulmonary embolism. (AR 428-29.) He was advised to see his primary care
15 | physician and was referred to the Coumadin clinic. (AR 429.) It was noted that he was likely okay to
16 | return to work within a week. (AR 429.)

17 |   On April 27, 2011, he was in the emergency room for complaints of pain and swelling in his arm
18 | and he was admitted and received anticoagulation treatment. (AR 404.) He was advised to continue
19 | Coumadin treatment, follow up with his physician and cardiologist, and was discharged as stable. (AR
20 | 404.) On December 12, 2011, his physical examination was normal. (AR 298.)

21 |   He saw Dr. Jennifer Vogt on February 15, 2012 for a follow up. (AR 305.) His physical
22 | examination was generally unremarkable. (AR 307-08.) It was noted that he did experience arm and
23 | chest pain, for which he was taking pain medication, and was taking nitroglycerin for his coronary artery
24 | disease. (AR 309.) He saw Dr. Vogt again on April 10, 2012. (AR 313-317.) He denied problems with
25 | chest pain or shortness of breath, though the doctor noted he was tachycardic in the clinic. (AR 313.) His
26 | alcoholism was discussed at length. (AR 314.) Insofar as his anticoagulation therapy was concerned, he
27 | reported feeling fine. (AR 314.) His physical examination was again unremarkable, though he was noted
28 | as slurring his speech. (AR 316.) Dr. Vogt addressed his non-compliance in terms of taking medication

and alcoholism. (AR 317.) She advised him to follow up with a cardiologist. (AR 317.) She suspected that the tachycardia was a result of alcohol withdrawal. (AR 317.)

Plaintiff saw Dr. Vogt next on May 10, 2012. (AR 321-324.) He had hit a platform with his forklift at work and company policy required him to be evaluated and released by his physician before he could return to work. (AR 321.) He had no pain as a result of the incident. (AR 321-22.) His physical examination was unremarkable. (AR 324.)

He returned to see Dr. Vogt on June 27, 2012, after he had a virus and missed some work. (AR 327-330.) His symptoms had resolved, and he reported he felt ready to return to work. (AR 328.) He had been sober at that point for two months. (AR 328.) His physical examination was unremarkable. (AR 330.) He was cleared to return to work. (AR 330.)

He next saw Dr. Vogt nearly six months later, on December 12, 2012. (AR 334-341.) In the time since he had last seen Dr. Vogt, Plaintiff had lost his job and started drinking again. (AR 334.) He reported having seizures, and had been seen in the emergency room. (AR 334, 343-350.) Since he had not been seeing her regularly, Dr. Vogt said she would not prescribe the anxiety medications in an unmonitored setting. (AR 335.) She would increase his seizure medication dosage. (AR 335.) She advised him to seek inpatient treatment for alcoholism. (AR 335.) The emergency room records indicate he reported he had not had a drink for a couple of weeks (AR 343), and Dr. Vogt noted that the seizures could be a symptom of withdrawal and needed to be closely monitored. (AR 335, 337.) Alternatively, the emergency room records state that he had been out of valium for a couple of weeks, and the seizures could have been caused by withdrawal from valium. (AR 346.) His physical examination in the emergency room was unremarkable. (AR 346.) It was noted that he had good range of motion in all joints, and normal gait. (AR 346.) He was stable when he was discharged from the emergency room to see Dr. Vogt. (AR 346.) He was assessed as having a low Dilantin (seizure medication) level, and as being noncompliant. (AR 346.) His physical examination with Dr. Vogt was also normal, other than a notation of the seizures. (AR 337.)

The next medical record (other than the reports of Dr. Corson and Dr. Lewis) is from a February 12, 2014 visit with Dr. Hersh Patel. (AR 508-511.) It was noted that Plaintiff was not able to afford Dilantin because he had been without insurance for two years. (AR 508.) He reported having seizures

and requested a referral to neurology. (AR 508.) His physical examination was unremarkable. (AR 509-511.) He saw Dr. Patel again March 18, 2014. (AR 505-507.) His coronary artery disease was noted as stable, and his hyperlipidemia was mild. (AR 505.) His physical examination was normal. (AR 506-07.) He was seen next on April 10, 2014. (AR 502-504.) His lab work showed normal cholesterol level, and he was noted as doing well on Lipitor. (AR 502.) He was also doing well, and there were no concerns concerning his anticoagulation. (AR 502.) His physical examination was normal. (AR 503-04.) He then saw Dr. Patel on May 7, 2014, with a complaint of straining his left quadriceps. (AR 499-501.) He was advised to use ibuprofen and heat for comfort and follow up if he did not get better. (AR 499.) His physical examination was otherwise normal. (AR 500-501.) There is no indication he returned to see Dr. Patel concerning this complaint.

Plaintiff was admitted to the emergency room two months later for alcohol intoxication after being found by a bystander. (AR 494-496.) He had no complaints at that time. (AR 494.) His physical examination was unremarkable. (AR 494-496.) He was discharged as stable. (AR 497.)

He saw Dr. Patel again on July 15, 2014, to discuss to his alcohol abuse. (AR 490.) He said he was committed to staying sober, and wanted to go to rehab. (AR 490.)

In sum, a review of the medical records (which the ALJ accurately summarized and discussed) supports the ALJ's finding that Dr. Corson's opinion regarding the standing, walking and postural limitations was not consistent with the generally unremarkable physical examinations throughout the record, and that the State agency consultants' opinions concerning Plaintiff's functional ability were more consistent with the record. As such, the court concludes that the ALJ did not err in assigning only some weight to Dr. Corson's opinion and affording more weight to the State agency consultants. Therefore, Plaintiff's motion should be denied and the Commissioner's cross-motion granted with respect to the medical opinion evidence.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Plaintiff's motion (ECF No. 13) and **GRANTING** the Commissioner's cross-motion (ECF No. 16).

/ / /

/ / /

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED: July 17, 2017.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE